

1  Don Howarth (SBN 53783)
   dhowarth@howarth-smith.com
2  Suzelle M. Smith (SBN 113992)
   ssmith@howarth-smith.com
3  Jessica L. Rankin (SBN 279237)
   jrankin@howarth-smith.com
4  HOWARTH & SMITH
   523 West Sixth Street, Suite 728
5  Los Angeles, California, 90014
   Telephone: (213) 955-9400
6  Facsimile: (213) 622-0791

7  David A. Rosen (SBN 101287)
   d.rosen@rkmlaw.net
8  ROSE KLEIN & MARIAS LLP
   801 S. Grand Avenue, 11th Floor
9  Los Angeles, California, 90017
   Telephone: (213) 784-2801
10 Facsimile: (213) 623-7755

11 Attorneys for Plaintiffs
   DEBRA DAWSON and CHRISTOPHER DAWSON
12

13            UNITED STATES DISTRICT COURT
14            CENTRAL DISTRICT OF CALIFORNIA

15
16 DEBRA DAWSON and CHRISTOPHER   ) CASE NO. CV12-10686 GW (JCGx)
   DAWSON,                        )
17                                )
          Plaintiffs,              ) COMPLAINT FOR:
18                                )
   vs.                            ) (1) Public Liability under the Price
19                                )     Anderson Act and Per Se
   THE BOEING COMPANY,            )     Liability for Breach of Federal
20 ROCKWELL AUTOMATION. INC.,     )     Exposure Regulations
   ROCKWELL COLLINS, INC.,        )
21 CONEXANT SYSTEMS INC. and      ) (2) Violation of Price Anderson
   MERITOR INC.,                  )     Act – Negligence
22                                )
                                  ) (3) Violation of Price Anderson
23        Defendants.              )     Act – Loss of consortium
                                  )
24 _____  )

25 / / /
26 / / /
27 / / /
28 / / /

COMPLAINT

## SUMMARY OF THE ACTION

1. This is an action arising under the Price Anderson Act, 42 U.S.C. § 2210 et seq. and applicable California law.

2. Plaintiffs have suffered personal injury, as well as other economic harm and losses, by virtue of the spills and releases of radioactive and other contaminants into the environment from the facility described herein as the Santa Susana Field Laboratory (hereinafter, "the SSFL") and the continuing health hazards posed by the contamination from the SSFL. As a direct and proximate result of the contamination caused by Defendants as alleged herein, Plaintiff DEBRA DAWSON has been significantly exposed to radioactive contaminants. By virtue of this exposure to radiation and contamination, Plaintiff has suffered serious diseases including, but not limited to, rectal and lung cancer. Plaintiff CHRISTOPHER DAWSON, husband of DEBRA DAWSON has suffered loss of companionship and the benefits of the pre-injury relationship with his wife.

3. Plaintiffs seek damages for personal injuries and harm suffered by them as a direct and proximate result of the activities conducted by the defendants named herein at the SSFL, which activities have resulted in the release of radioactive and other contaminants into the environment and into the air, soil and ground water; attorneys' fees, costs and interest to the extent allowable by law; and such other and further relief as may be just and equitable.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to the Price-Anderson Act 42 U.S.C. § 2210(n) (2). "With respect to any public liability action arising out of or resulting from a nuclear incident, the United States District Court in the district where the nuclear incident takes place... shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy." Moreover, a public liability action is defined as any action "arising under section 2210 of this title." 42 U.S.C. § 2014(hh). Because this action stems

1

1  from nuclear incidents, it falls under the provisions of the Price-Anderson
2  Amendments, and thus is within the Court's jurisdiction pursuant to 42 U.S.C. §
3  2210(n) (2).

4      5.    According to 42 U.S.C. § 2014(hh), "the substantive rules for decision in
5  such action shall be derived from the law of the State in which the nuclear incident
6  involved occurs, unless such law is inconsistent with the provisions of such section."
7  In this case, the substantive law of the State of California shall apply to this action,
8  and accordingly state law causes of action are incorporated in the federal statute and
9  must be adjudicated against defendants in this Federal Court.

10      6.    This Court has jurisdiction over the federal claims asserted in this action
11  under 28 U.S.C. § 1331, which provides for original jurisdiction in the United States
12  District Courts for civil actions arising under the laws of the United States. This
13  Court has supplemental jurisdiction over the state law claims asserted in this action
14  pursuant to 28 U.S.C. § 1367(a).

15      7.    Venue is proper in this judicial district under 42 U.S.C. § 2210(n) (2)
16  and 28 U.S.C. § 1391(a), since the claims of Plaintiffs arose in this judicial district,
17  and under 42 U.S.C. § 9659(b), since the releases and threatened releases of
18  radioactive contaminants into the environment which give rise to the claims of
19  Plaintiffs have occurred, and the resulting damages have been suffered, in this
20  judicial district. Venue also is proper in this judicial district pursuant to 28 U.S.C. §
21  1391(b) and (c) because Defendants transact substantial business within, and are
22  subject to personal jurisdiction in, this judicial district, because Plaintiffs reside in
23  this judicial district, and because a substantial part of the events giving rise to the
24  claims asserted herein took place in this judicial district.

25      8.    Defendants The Boeing Company, Rockwell Automation, Inc.,
26  Rockwell Collins, Inc., Conexant Systems, Inc., and Meritor, Inc. are found and
27  reside in California.
28  ///

# PLAINTIFFS

9. Plaintiffs DEBRA DAWSON and CHRISTOPHER DAWSON, wife and husband are individuals residing in Valencia, California.

10. Plaintiff, DEBRA DAWSON lived less than three miles from the SSFL from approximately 1986 to 1999, within one mile of the SSFL from 2000 into 2001, and within two miles of the SSFL from 2001 through 2007. The SSFL is located between the Simi and San Fernando Valleys in Ventura County, California. Since 1948, the SSFL has been used for testing nuclear reactors. Plaintiff DEBRA DAWSON was injured by radiation and radioactive materials and wastes generated at the SSFL and released off site, and has developed rectal and lung cancer caused thereby.

11. Plaintiff DEBRA DAWSON was diagnosed with rectal cancer on or about January 5, 2011, based upon surgical pathology. She began chemotherapy and suffered an anaphylactic reaction and bacterial infection as a result. She has undergone oral chemotherapy. She has undergone colon and rectal surgery. Debra Dawson was diagnosed with metastatic lung cancer in 2012. Her treating doctor, Dr. John Barstis M.D., a board certified Oncologist, has attributed the cause of her cancer to radioactive contamination released from the SSFL. Mrs. Dawson was a physical trainer before she developed cancer, with no risk factors for cancer known to her. She was in excellent health. Attached as Exhibits A and B are photographs of Mrs. Dawson before and after her diagnosis of cancer.

12. Plaintiff CHRISTOPER DAWSON is the husband of DEBRA DAWSON, who was injured by radiation and radioactive materials and wastes generated at the SSFL, and has developed cancer. Mr. Dawson has suffered from the injuries to his wife by virtue of the damage to their marital relationship.

///
///
///

## DEFENDANTS

13. Defendant The Boeing Company (hereinafter "Boeing") is a Delaware company with an office in Seal Beach, California 90740. Boeing is one of the country's leading aerospace concerns and is engaged primarily in the business of research, development and testing of rocket engines, lasers, nuclear reactors and fuels and other related technologies. Boeing owns and/or operates the SSFL.

14. Defendants Rockwell Automation, Inc., a Delaware corporation with its principal place of business located in Milwaukee, Wisconsin, Rockwell Collins, Inc., a Delaware Corporation with its principal place of business located in Cedar Rapids, Iowa, Conexant Systems, Inc., a Delaware Corporation with its principal place of business located in Newport Beach, California, and Meritor, Inc., an Nevada Corporation with its principal place of business located in Troy, Michigan, are corporate successors in interest to Rockwell International Corporation (hereinafter "Rockwell International"). Rockwell International owned and operated the SSFL and researched, developed and manufactured products for aerospace and defense until it sold the SSFL to Boeing in 1996. Rockwell International no longer exists. Rockwell International transferred its assets and continued to carry on the same business with similar shareholders and directors to the above named corporations and such corporations may thus be held liable for the wrongdoing of its predecessor corporation, Rockwell International.

15. Plaintiffs are informed and believe and thereon allege that Defendants DOES 1 through 10, inclusive, and each of them, at all times mentioned herein were individuals, corporations, or other organizations or entities organized and existing under the laws of their states of incorporation, and were doing business in the State of California.

16. The true names or capacities, whether individual, corporate, associate, governmental, or otherwise, of Defendants DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiffs at this time and therefore Plaintiffs sue said

Defendants by such fictitious names. Plaintiffs will amend this complaint to show their true names and capacities when the same have been ascertained. Plaintiffs are informed and believe and thereon allege that the Defendants, and each of them, herein designated as DOES are legally responsible in some manner presently unknown for the events and happenings referred to herein, and which caused the injuries for which Plaintiffs now seek damages.

17. Plaintiffs are informed and believe and thereon alleges that at all times mentioned herein, Defendants, and each of them, were the agents, servants, employees, and/or joint venturers of their co-Defendants and were, as such, at all times mentioned herein, acting within the scope, course, and authority of said agency, employment, and/or joint venture.

## FACTS COMMON TO ALL COUNTS

18. Operations at the SSFL have involved the use, storage, generation, and/or disposal of vast amounts of radioactive materials, including, but not limited to plutonium, uranium, tritium, strontium, and cesium, which materials constitute source, special nuclear, or byproduct materials as defined in the Atomic Energy Act 42 U.S.C. Section 2011 *et seq.* Plutonium is a powerful carcinogen with a half life of 20,000 years and is one of the most hazardous substances known to science. Plutonium fuel for nuclear reactors was fabricated at the SSFL.

19. Over the course of five decades, Defendants repeatedly released radioactive contaminants into the ground, water and air, thereby contaminating the neighboring communities, where Plaintiff DEBRA DAWSON lived.

20. Numerous releases of radioactive contaminants from the SSFL have occurred over the past five decades. However, due to a lack of funds, the SSFL went unmonitored by the EPA for much of this time. As a result, the SSFL was left to monitor itself and most of the releases went unreported and undocumented.

///
///

## Defendants' Nuclear Contamination

21. After World War II ended, one or more of Defendants held contracts with the U.S. Atomic Energy Commission and its successor, the Department of Energy (DOE), to operate experimental nuclear reactors at the SSFL.

22. Defendants operated 16 nuclear reactors and a "hot lab" for handling radioactive fuel between the 1950's and the 1980's at the Santa Susana Field Laboratory. The nuclear testing was stopped in 1990. During the course of these four decades of nuclear testing, unbeknownst to homeowners neighboring the high security facility, a number of releases and other "accidents" and practices at the SSFL caused cesium, tritium and other radioactive elements to leak into the water and ground beneath the sites. In addition, several partial meltdowns of the reactors which occurred in the 1950 have caused dangerous levels of radiation to be released into the atmosphere.

23. Radioactive discharges from SSFL occurred in several ways, including: via reactor accidents which released radiation into the air; via contaminated water which drained into unprotected ponds or leach fields; and via outdoor explosions in the burn pit or otherwise, which released radiation into the air and also deposited radiation in the ground, to leak into the groundwater.

24. Defendants admit to the following reactor accidents at the SSFL:
   a. On March 25, 1959, fission gas was released from reactor AE-6 at the Santa Susana Field Laboratory contaminating a containment room and several members of the operating staff. The reactor reportedly scrammed due to improper operating procedures which allowed it to reach double its maximum allowable power.
   b. On July 13, 1959, Reactor SRE at the Santa Susana Field Laboratory had a "power excursion." The reactor's power increased uncontrollably - a serious sign of malfunction. Despite this problem, the reactor was negligently started up again two hours later. An Atomics/Energy

Commission report concluded: "It is quite clear that the reactor should have been shut down and the problems solved properly. Continuing to run it in the face of a known tetralin leak, repeated scrams, equipment failures, rising radioactive releases, and unexplained transient effects is difficult to justify. Such emphasis on continued operation can and often does have serious effects on safety and can create an atmosphere leading to serious accidents."

c. Just weeks thereafter, the very same reactor, SRE, suffered a partial meltdown. Thirteen of the 43 fuel elements melted. Ten thousand curies of radiation were released mostly into the coolant, and radioactive gases xenon and krypton were slowly released into the atmosphere over a year's period. The extent of the release to the environment could not be measured since some of the radiation monitors went off scale during parts of the "accident," others malfunctioned, a device to automatically route high radioactivity to storage tanks did not work, and some of the monitors were incapable of measuring xenon and krypton since they are noble gases.

25. In addition to the "known" reactor accidents which have occurred at the SSFL, there were a number of non-reactor accidents which have caused radiation to be released into the groundwater, surface water, soil and air and carried in large quantities to the surrounding neighborhoods and communities where Plaintiff DEBRA DAWSON lived.

26. The SSFL has had a series of catastrophic nuclear accidents, for example, in 1957 there was a fire within the "Hot Lab", a facility that was used for remotely cutting up irradiated nuclear fuel, which released large amounts of uncontrolled radiation, including off site.

27. On June 4, 1959, a fuel rod exploded at the Santa Susana Field Laboratory. The rod, dripping with sodium, was washed with water in a "wash cell."

1 Sodium explodes in the presence of water. The explosion created a "pressure surge"
2 that created an extremely high contamination level within the entire building. Air
3 from the building was vented to the atmosphere, thus resulting in yet another
4 radioactive release into the environment and the surrounding communities.

5     28. During the 1960's and early 1970's, Defendants leaked radioactively-
6 contaminated water, including water containing strontium-90 and yttrium-90, into a
7 leach field at the Santa Susana Field Laboratory. The radioactive waste did what
8 normal sewage does: it percolated or leached into the ground and into the
9 groundwater. The leach field sits above a rock formation known as the Chatsworth
10 Formation, which is the formation from which groundwater is drawn.

11     29. While investigating the results of one such spill, radiation was found in
12 the soil beneath the leach field. In July 1976, while making a site radiological survey,
13 contaminated vegetation was discovered at the leach field. Defendants then waited
14 two years, until 1978, to "clean up" the contaminated leach field. The soil was
15 excavated, and the joints and fractures in the Chatsworth Formation were sealed with
16 asphalt.

17     30. Additionally, Plaintiffs are informed and believe that radioactive tritium
18 leaked into a drain at the Santa Susana Field Laboratory.

19     31. Defendants also conducted numerous outdoor burnings and explosions
20 that emitted radioactive waste. Radioactive emissions resulted from explosions set
21 off in the burn pit, created to dispose of liquid sodium and sodium-potassium
22 mixtures used in experimental reactor tests. After draining a reactor system,
23 Defendants then removed the small quantities of liquid metal trapped in the elbows,
24 valves, vessels, or insulation materials of the system, by exposing the contaminated
25 component to water. This created an explosion.

26     32. Defendants either placed the contaminated component in a concrete
27 water pool or in an unlined pond and hosed it down. After the explosion, the
28 component was either removed and sold for scrap or buried on site.

33. Plaintiffs are also informed and believe that there was a tetralin explosion at the Santa Susana Field Laboratory. While in storage in a sodium lab, the tetralin exploded, igniting the sodium. The blast gutted the interior of the building and released hazardous waste into the environment.

34. A 1959 report notes that inadequately protected or identified containers of radioactive waste were stored outdoors at the SSFL and that the radioactive materials were then transferred to drums containing concrete without radiation monitoring, marked "Mixed Fission Products," and then dumped into the ocean.

35. Additionally, the pond areas, downslope from the concrete water pool, are incompletely bermed, and water occasionally overruns the pit to surrounding areas. At the Santa Susana Field Laboratory, waste liquids went from the plutonium facility sewage to a receiver tank, then were transferred to a second tank, and then were released to the ground where they flowed to any number of natural settling ponds in the Santa Susana Mountains and into Bell Canyon Creek.

36. The contamination at the Santa Susana Field Laboratory was discovered beginning at least in the 1970's. At that time, Defendants attempted to clean the burn pit area and found levels of radioactive material on the pond walls. In 1980, Defendants' radiation survey found radioactive contamination in the unlined dry ponds and the lower pond and identified cesium-137 as the principal gamma-emitting constituent.

37. Prior to 1989, federal and state regulatory agencies allowed aerospace defense contractors to dispose of hazardous waste generated in the manufacture of large rapid engines and propellers simply by blowing it up. At the Santa Susana Field Laboratory, this practice was known as "thermal treatment."

38. In 1989, the State of California ordered Rockwell to halt "thermal treatment" of all hazardous waste generated at the SSFL. On November 15, 1989, the DOE announced that it had awarded Rockwell a $34.6 million DOE contract in

///

9

1 connection with government mandated decontamination of the Santa Susana Field
2 Laboratory (DOE clean-up contract).

3     39.    In December, 1989, Rockwell was informed that: (1) it had been
4 awarded the DOE clean-up contract; (2) pursuant to the terms of the contract, $6.4
5 million of the $34.6 million awarded was required to be spent to remove chemical
6 and radioactive contamination from a disposal site known as the "Area 1 Burn Pit", a
7 site that had long been used by Rockwell to "thermally treat" a variety of hazardous
8 wastes including waste rocket fuel; and (3) under the terms of the DOE contract,
9 Rockwell was prohibited from using the "Area 1 Burn Pit" for any future disposal of
10 hazardous waste at the Rocketdyne Facilities other than in accordance with the
11 requirements imposed by the RCRA. In 1990, the California Department of Toxic
12 Substances Control (DTSC), the lead regulatory agency responsible for monitoring
13 Rockwell's compliance with federal and state environmental laws, conducted
14 regulatory inspections of the Rocketdyne Hazardous Waste Facility and concluded
15 that:

16 a.   Rockwell's part A EPA application for the Rocketdyne Hazardous
17       Waste Facility filed by the company on November 17, 1980 improperly
18       characterized the "Area 1 Burn Pit" as a "waste pile" and failed to
19       disclose that the Area 1 Burn Pit would be used for "open pit burning" of
20       hazardous waste including the burning of waste rocket propellants;
21 b.   The DTSC had advised Rockwell by letter in December 1983 that
22       the company's part A permit application was materially deficient;
23 c.   Because Rockwell had never complied with the requirements set
24       forth in the DTSC's December, 1983 letter, the EPA never issued
25       Rockwell the part A permit required by 42 U.S.C. Sec. 6925(a), and
26       Rockwell therefore was never authorized to store and/or destroy hazardous
27       waste at the Rocketdyne "Area 1 Burn Pit"; and
28 ///

  d. Despite never having been issued the requisite part A permit, Rockwell had routinely utilized the SSFL "Area 1 Bum Pit" to detonate "gaseous propellants in cylinders and advanced scrap propellants," (i.e., hazardous waste) and had unlawfully stored numerous "drums of radioactive hazardous waste," some of which had been in storage since January 1978.

  40. Upon concluding the January 1990 regulatory inspection, the DTSC referred the matter to the Attorney General of the State of California who in turn commenced enforcement proceedings against Rockwell. On August 2, 1990, the EPA served Rockwell with a federal enforcement order charging 9 counts of violations of RCRA arising out of the company's failure to properly store containers of hazardous waste.

  41. As a result, on or about October 23, 1990, Rockwell admitted to having violated environmental laws by having treated hazardous waste without a permit using its thermal destruction unit in the burn pit of Area 1 since approximately 1961. Rockwell incurred a $280,000 penalty assessed by the State of California in order to settle all charges arising out of violations of discovery during the DTSC 1989 and 1990 inspections of the SSFL. Despite orders by both CAL/OSHA and the Federal EPA forbidding Rockwell from disposing of toxic waste by burning or blowing it up, Rockwell continued in this practice at the Santa Susana Field Laboratory leading to the State lodging a complaint against the firm in 1990. In 1992, Rockwell agreed to pay $650,000 in settlement of the complaint. The practice of thermal treatment at the Rocketdyne Facilities, however, had not stopped.

  42. The operations of the SSFL were veiled in secrecy. For decades, thousands of residents in the communities surrounding the SSFL have used the water, breathed the air, worked the soil, sowed crops, raised livestock and consumed the fruits of their labor. Unbeknownst to these innocent residents, they have been exposed to the contaminated water, soil and air, including the radioactive and hazardous vapors and dust particles blown over their homes.

43. The ongoing state and federal mandated cleanup efforts, continue to expose Plaintiffs to radioactive contaminants and hazardous substances. As the substances which for years have saturated the buildings and soil beneath the Rocketdyne Facilities are dug up and disturbed, highly toxic radioactive dust particles will continue to be carried by the winds over the neighborhoods and homes near the area. It is for this reason, among others, that the San Fernando Valley Board of Realtors requires that sellers of real property in the greater Simi Valley and San Fernando Valley area obtain the signature of any buyer on a disclosure statement which indicates that there are toxic waste and radioactive substances still on site at the Santa Susana Field Laboratory.

44. Furthermore, Defendants have admitted they will incur over $28 million in future litigation costs in connection with the Santa Susana Field Laboratory alone. Defendants knew there were problems at the Santa Susana Field Laboratory and were prepared to pay for the damages they caused. Defendants, therefore, tendered to their insurance carriers a demand for coverage. This tender resulted in years of litigation and a confidential settlement. In that litigation, Defendants claimed knowledge of potential claims for injuries and damages and demanded in excess of $28 million.

45. Defendants' illegal disposal of radioactive waste extended to at least July 1994. The ongoing, present attempted remediation and clean up of the contaminated site continue to expose Plaintiffs to radioactive, toxic emissions.

46. In addition, in or around late 1999 through 2000, Defendants began trucking contaminated soil to and from the SSFL as part of its effort to clean up the burn pits. Defendants' trucks were traveling on residential streets at night, near Plaintiff DEBRA DAWSON'S home. The contaminated soil was not properly stored or placed in containers for radioactive waste, but was simply put in the back of the trucks and covered with a tarp. Debra Dawson was exposed to contamination from these trucks, which she saw as she drove her car in her neighborhood. She was blocked by these trucks for significant periods of time due to traffic congestion.

47. Soil samples taken off site and in the surrounding communities where Plaintiff Debra Dawson resided show radioactive isotopes in the soil, groundwater and portions of the Los Angeles River. Tests conducted by Defendants in 1991 on the soil and groundwater of the Brandeis-Bardin Institute, located adjacent to the Santa Susana Field Laboratory, and confirmed off-site contamination. The contamination has not been cleaned up even today, although there are government requirements that Boeing remediate the environment. Cleanup efforts for contamination are being conducted by DOE, Boeing and NASA under the direction and oversight of the State of California Department of Toxic Substances Control (DTSC) under the Resource Conservation and Recovery Act (RCRA). The extent of contamination is not fully characterized. Radionuclides from the SSFL Energy Technology and Engineering Center (ETEC) nuclear operations include tritium, plutonium-238, plutonium-239, iodine-131, strontium-90, cesium-137, cobalt-60, thorium-228, and uranium-235. Decommission and demolition of ETEC buildings has been conducted by DOE pursuant to the Atomic Energy Act.

48. The 2008 Federal Appropriations Law (HR2764) directed DOE to use a portion of DOE funding for the SSFL site to enter into an interagency agreement with the EPA to conduct a joint comprehensive radioactive site characterization of Area IV of the SSFL in accordance with the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). The EPA has published reports in 2012 which show there was significant radioactive contamination from the SSFL.

### Plaintiff Was Exposed to Defendants' Radioactive Materials

49. The operations of the subject SSFL were veiled in secrecy. For decades, thousands of residents in the communities surrounding the SSFL have used the water, breathed the air, and grown vegetables. Unbeknownst to these innocent residents, they have been exposed to the contaminated water, soil and air, including the radioactive and hazardous vapors and dust particles blown over their homes.

///

50. As a direct and proximate result of the contamination caused by Defendants, Plaintiff DEBRA DAWSON has been significantly exposed to dangerous levels of radiation in excess of government regulatory standards, including but not limited to 10 C.F.R § 20.1301.

51. Many of the releases have been and continue to be airborne releases. Radioactive contaminants were released into the air, either as vapors or in the form of particles of the order of microns in size, and were transported to the environment surrounding the SSFL by the winds in dispersal patterns depending in part on the meteorological conditions prevailing at the time of each release. The sources of such airborne releases have included volitization from spills, resuspension of dust and droplets from past spills and from ongoing remediation activities, direct airborne releases not captured by vents, evaporation and wind causing escape from contaminated holding tanks, direct burning of hazardous materials, and accidental fires.

52. In addition, radioactive contaminants are now known to have contaminated, and continue to contaminate, ground and surface water as a result of significant releases from the SSFL.

## Causation

53. Plaintiff DEBRA DAWSON's repeated unknowing exposures to dangerous and unreasonable levels of radiation and particulate radioactive materials, which particulate radioactive materials caused and were a substantial factor in causing Plaintiff DEBRA DAWSON's cancer and injuries as set forth herein. Her treating doctor, Dr. John Barstis M.D., a Board Certified Oncologist, has given the opinion "Based upon all of the foregoing, I have come to certain opinions and conclusions as to the etiology of Ms. Dawson's rectal cancer. In view of the medical and epidemiological literature; Ms. Dawson's personal and familial history; her clinical history, results, and course; as well as my education, training, background, experience, and expertise, it is my opinion to a reasonable degree of medical certainty

14

that Ms. Dawson's rectal cancer was caused at least in part by her exposure to chemicals and radiation during her years as a resident living within close proximity of the SSFL."

54. Defendants knew or should have known that the exposure of Plaintiff DEBRA DAWSON to such radiation and/or particulate radioactive materials could foreseeably lead to the injuries suffered by Plaintiff as described herein. By concealing such exposure from Plaintiff DEBRA DAWSON, Defendants effectively concealed the fact and the source of the injuries sustained by Plaintiff DEBRA DAWSON. By doing so, Defendants thereby prevented Plaintiff DEBRA DAWSON from receiving proper medical care and advice concerning her injuries, and thus aggravated her injuries.

### Cancer

55. Radiation and radioactive isotopes are known carcinogens.

56. Plaintiff has been diagnosed with rectal and lung cancer, which are aggressive and forms of cancer that are known to be caused by low level radiation.

57. Treatment for rectal and lung cancer generally involves chemotherapy and surgery. Plaintiff underwent chemotherapy but could not complete this treatment due to medical complications. Plaintiff has undergone colon and rectal surgery, as well as treatment for her lung cancer.

58. Plaintiff is aware that Plaintiff's former husband, Mark Lindsey, with whom Plaintiff DEBRA DAWSON lived in proximity to the SSFL from 1986 to 1999, has also been diagnosed with rectal cancer in 2006. Mr. Lindsey and Plaintiff are not blood relatives and rectal cancer is not a contagious disease.

### FIRST CAUSE OF ACTION
**(Public Liability under the Price Anderson Act and Per Se Liability for Breach of Federal Exposure Regulations)**

59. Plaintiffs repeat and incorporate herein by reference the allegations contained in paragraphs 1 through 58 above.

COMPLAINT

60. The actions and conduct of Defendants as alleged herein subject Defendants to public liability under 42 U.S.C. § 2210 of the Price Anderson Act for the nuclear accidents which have occurred at the SSFL.

61. Plaintiffs are informed and believe that the radiation released into the environment from the SSFL occurred as a result of numerous and repeated violations of state and federal environmental health and safety statutes and regulations, including but not limited to 10 C.F.R. §§ 20.1101, 20.1301, 20.1302, 20.1501, 20.1801, 20.1802, 20.2001, 20.2003, 20.2004, 20.2006, 20.2007, 20.2103, 20.2107, 20.2108, 20.2202, 20.2203, 20.2205, and any other applicable C.F.R. and NRC regulations.

62. As a direct and proximate result of the nuclear accidents that have occurred at the SSFL as alleged herein, Plaintiff DEBRA DAWSON has been significantly exposed to hazardous radioactive substances having toxic and carcinogenic properties in excess of federal guidelines and requirements which caused and was a substantial factor in causing her resultant losses and damages, including her cancer. Plaintiff DEBRA DAWSON has suffered damages, including, but not limited to, cancer and other physical damage to her person for which she is entitled to recover compensatory damages in an amount according to proof at trial. Plaintiff CHRISTOPHER DAWSON has suffered damages from the damage to and loss of the pre-injury relationship of his wife.

63. In addition to the above, and also as a direct and proximate result of her exposure to radioactive contaminants, Plaintiff DEBRA DAWSON continues to have an increased risk of contracting and suffering from another serious latent disease, injury or illness. This increased risk makes periodic diagnostic medical examinations reasonably necessary. Medical monitoring and testing procedures exist which make the early detection of such latent diseases, injuries and illnesses possible and beneficial, and a damages award for a comprehensive program of medical monitoring should be made to Plaintiffs.

16
COMPLAINT

## SECOND CAUSE OF ACTION

### (Violation of Price Anderson Act -Negligence)

64. Plaintiffs repeat and incorporate herein by reference the allegations contained in paragraphs 1 through 58 above.

65. Defendants owed a duty to Plaintiff DEBRA DAWSON to conduct their activities with reasonable care and, given the radioactive nature of the activities in which Defendants engaged, had a heightened duty to undertake no acts that would endanger the surrounding environment. Defendants had a duty to keep use procedures and engineering controls based upon sound radiation protection principles to achieve doses to the members of the public that are as low as reasonably achievable.

66. Defendants had a continuing duty to Plaintiff DEBRA DAWSON to exercise due care and diligence in the operation of their business, the storage of all hazardous radioactive substances, the construction, supervision, maintenance and operation of the manufacturing processes and storage facilities for radioactive substances, and the training and supervision of the personnel used by Defendants to conduct those aspects of their business which related to the use, storage and/or disposal of hazardous radioactive substances. Defendants also had, and still have, a continuing obligation to warn Plaintiff DEBRA DAWSON of the releases and/or threatened releases of hazardous radioactive substances into the environment and communities surrounding the SSFL and of the reasonably foreseeable effects of such releases.

67. Defendants also breached their duties to Plaintiff DEBRA DAWSON by failing to exercise ordinary care and due diligence, by not maintaining doses to the members of the public that were as low as reasonably achievable, and by negligently permitting the circumstances to exist that led to the release of hazardous radioactive substances into the areas and communities surrounding the SSFL including, but not limited to, the negligent operation, maintenance, and inspection of their business, as